IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT REVAK and | : | |
| MARGARET REVAK | : | CIVIL ACTION |
| | : | |
| v. | : | No. 03-4822 |
| | : | |
| INTERFOREST TERMINAL UMEA AB | : | |
| and WAGENBORG SHIPPING, B.V. | : | |

**SURRICK, J.**                                                    **MAY  14 , 2009**

<u>MEMORANDUM</u>

Presently before the Court is Defendant Wagenborg Shipping BV's Motion for Summary Judgment.  (Doc. No. 12.)  For the following reasons, the Motion will be denied.

**I.     BACKGROUND**

Robert Revak ("Plaintiff") worked as a longshoreman at a shipping terminal in the Port of Philadelphia.  Plaintiff and his wife, Margaret Revak, brought this negligence action under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-950, after he was injured by a draft of timber that fell on him after a sling broke as the timber was being hoisted from the cargo-hold of a ship.  Wagenborg Shipping, B.V. ("Defendant") owned and operated the cargo ship, the *Morraborg*, from which the timber fell.  The following facts leading up to the accident are drawn in the light most favorable to Plaintiff as the nonmoving party.

**A.     Loading of the *Morraborg* in Sweden**

On August 23, 2002, the *Morraborg* arrived at the port of Holmsund, Sweden, to pick up 1157 packages of sawn timber to ship to Philadelphia.  (Doc. No. 12 ¶ 17; Doc. No. 49 ¶ 17.)  The sawn timber had been organized into lifting units called "drafts," each of which consisted of five packages of timber weighing thousands of pounds.  (Doc. No. 12 ¶ 4; Doc. No. 49 ¶ 4.)

Interforest Terminal UMEA AB ("Interforest"), a professional stevedore company in Holmsund, was responsible for loading the drafts of sawn timber into the *Morraborg*.  (Doc. No. 12 ¶¶ 2-3; Doc. No. 49 ¶¶ 2-3.)  Interforrest began loading the drafts into the vessel's cargo shortly after the ship arrived.  (*Id.*)  In order to hoist the drafts from the pier and into the cargo hold, Interforest used polyester slings that were placed under each draft and then attached to the hook of a cargo crane.  (Doc. No. 12 ¶ 7; Doc. No. 49 ¶ 7.)  The slings consisted of an endless loop of polyester material with a rated lifting capacity of 3.5 metric tons.  (Doc. No. 12 ¶ 8; Doc. No. 49 ¶ 8.)  Interforest used two slings per draft, for a total of 468 slings.  (Doc. No. 12 ¶ 8; Doc. No. 49 ¶ 8; Kuursta Dep. 58.)  Defendant leased the slings that Interforest used in its loading of the *Morraborg* from Locatum, a Swedish company in the business of supplying cargo slings to the maritime industry.  (Doc. No. 12 ¶ 9; Doc. No. 49 ¶ 9.)

As a professional stevedore company, Interforest had primary control over cargo operations and required no special instructions from Defendant regarding how to properly load the drafts.  (Doc. No. 12 ¶ 5; Doc. No. 49 ¶ 5.)  After the drafts of timber had been placed in the cargo hold of the *Morraborg*, Interforest left the slings draped over each draft so that they could be used to unload the timber in Philadelphia.  (*See* Doc. No. 50, Exs. 23B, 23C.)  On August 24, 2002, Interforest finished loading the drafts.  (Doc. No. 12 ¶ 17; Doc. No. 49 ¶ 17.)  The hatches to the vessel's cargo holds were sealed, and the vessel departed Holmsund en route to Philadelphia.  (*Id.*)

**B.     The *Morraborg*'s Arrival in Philadelphia**

The *Morraborg* arrived at the port of Philadelphia on September 8, 2002, after an uneventful trans-Atlantic voyage.  (Doc. No. 12 ¶ 18; Doc. No. 49 ¶ 18.)  Plaintiff and other

employees of the J&H Stevedoring Company – not a Defendant in this case – began unloading the drafts.  (Doc. No. 12 ¶ 19; Doc. No. 49 ¶ 19; Doc. No. 49-2 at 8.)  Plaintiff's job was to assist in turning the drafts as they were being placed on the pier in Philadelphia so that forklift trucks could move the drafts into a nearby warehouse.  (Pl.'s Dep. 52.)  The unloading was nearly complete when, as the stevedores were hoisting the last draft from the bottom of the vessel's cargo hold and onto the pier, one of the polyester slings parted and spilled the draft onto Plaintiff, who was standing on the pier.  (Doc. No. 12 ¶ 19; Doc. No. 49 ¶ 19; Pl.'s Dep. 62.)  This particular draft had been stowed at the bottom of the cargo hold beneath the other drafts.  (Doc. No. 12 ¶ 20; Doc. No. 49 ¶ 20.)  Because of its position, neither the draft nor its slings were visible to anyone upon opening the hatches to the cargo hold.  (*Id.*)  Plaintiff was severely injured and has been unable to work since the accident.

### C.    Condition of the Sling after the Accident

Robert A. Erb, Ph.D., a materials scientist and Plaintiff's expert, examined the sling after the accident.  (*See* Doc. No. 50, Ex. 35, at 5 (hereinafter "Erb Report").)  The sling was "old and well worn" and had multiple abrasions, unravelings, and edge damage.  (*Id.* at 4.)  Erb concluded that the edge damage and abrasive damage on the sling preexisted the failure on September 8, 2002, and would have been "readily visible" during an inspection of the sling before the accident.  (*Id.*)  The standards-specified label was also missing from the sling.  (*Id.*)  Erb evaluated the fibers that extended toward the break on the sling and concluded that "[t]his indicates that there was damage to the fabric in that area prior to the failure."  (*Id.* at 5.)  Captain Bijkert, the Master of the *Morraborg* at the time of the accident, saw photographs of the sling during his deposition. Bijkert testified that if he had seen the conditions of the sling shown in the photographs, he

3

"should have refused it because there's a broken part on it." (Bijkert Dep. 145.)  The condition

of the sling was "obvious." (Erb Report, Doc. No. 50, Ex. 35, at 6.)

Defendant's general practice was to perform an accounting of the slings after every

voyage. (Kuursta Dep. 31.)  After cargo is unloaded from the ship and the slings are returned on

board, Defendant generally counts the slings "just to see whether there's any losses and whether

they have been all returned." (*Id.*)  Defendant is invoiced for any lost slings. (*Id.*)  During this

accounting – something less than a full inspection – Defendant looks at the slings "to see what

kind of condition they are in." (*Id.*)  Defendant "sets aside" any slings that it deems unfit for

further use. (*Id.* at 33.)  Of the 468 slings that were loaded onto the *Morraborg*, Defendant and

the stevedores set aside 84 of them – or twenty percent – as being unfit for use after the voyage.

(*Id.* at 58.)  This was an "extraordinarily high amount of slings" needing to be discarded. (*Id.* at

58-59.)  By comparison, Defendant and the stevedores set aside 12 of the 822 slings – less than

two percent – as unfit for use in the voyage immediately prior to the voyage to Philadelphia. (*Id.*

at 41.)

### D.    Plaintiff Files Complaints

On August 22, 2003, Plaintiff filed a civil action alleging negligence against Interforest

and Locatum. (*See* Compl., Doc. No. 1.)  Plaintiff's claims against Locatum were dismissed for

lack of personal jurisdiction. (*See* Doc. No. 36.)  On September 4, 2004, Plaintiff filed a separate

action for negligence against Defendant. (*See* Compl., Doc. No. 1, *Revak v. Wagenborg*

*Shipping BV*, Case No. 04-4253 (E.D. Pa. Sept. 4, 2004).)  The actions against Interforest and

Defendant were consolidated with the above-captioned case on April 6, 2005. (*See* Doc. No. 35.)

Defendant filed the instant motion for summary judgment.

4

II.     **LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of demonstrating that there are no facts supporting the nonmoving party's legal position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (explaining that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The nonmoving party "cannot 'rely merely upon bare assertions, conclusory allegations or suspicions' to support its claim." *Fin. Software Sys., Inc., v. Lecocq*, No. 07-3034, 2008 WL 2221903, at \*2 (E.D. Pa. May 29, 2008) (*quoting Fireman's Ins. Co. v. DeFresne*, 676 F.2d 965, 969 (3d Cir. 1982)). Rather, the party opposing summary judgment must go beyond the pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. When deciding a motion for summary judgment, we must view facts and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995). We must not resolve factual disputes or make credibility determinations. *Siegel Transfer*, 54 F.3d at 1127.

5

### III.    DISCUSSION

Plaintiff's claim arises under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901-950, which establishes workers' compensation benefits for longshoremen injured in work-related accidents. *See* 33 U.S.C. § 903(a).  Regardless of fault, the longshoreman's employer must compensate the injured worker and his or her family with medical, disability, and death benefits.  *See id.* §§ 904, 907-09.  In 1972, Congress amended the LHWCA to "shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries, the stevedore-employer."  *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 97 (1994).  However, the LHWCA still allows a longshoreman to seek damages against a third-party vessel owner for injuries resulting from the vessel's negligence.  *See* 33 U.S.C. § 905(b).  The statute does not define what actions constitute negligence.  Individual questions are therefore resolved largely by the application of general tort principles.  *See Howlett*, 512 U.S. at 97-98; *see also England v. Reinauer Transp. Co.*, 194 F.3d 265, 270 (1st Cir. 1999) (noting same).

The Supreme Court has provided some guidance with regard to a shipowner's duty to longshoremen.  *See Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981).  In *Scindia*, the Court outlined the application of § 905(b) to relations between a longshoreman and a vessel owner.  *Id.* at 164-72.  The Court placed the primary responsibility for avoiding accidents on the stevedore because he is "in the best position to avoid accidents during cargo operations."  *Id.* at 171 (citations omitted).  While the vessel owner generally has the right to expect that the stevedore will perform his task safely and properly "without supervision of the ship," *see id.* at 170, the Court noted situations in which a shipowner's duty to exercise due care arises and

6

delineated three aspects of that duty, *see id.* at 166-72; *see also Howlett*, 512 U.S. at 98 (characterizing the *Scindia* decision as outlining three aspects of the shipowner's duty).

First, the shipowner has a "turnover duty" to warn the longshoremen of hazards from gear, equipment, tools, and workspace to be used in cargo operations "[t]hat are known to the ship or should be known to it in the exercise of reasonable care." *Scindia*, 451 U.S. at 167; *see also Howlett*, 512 U.S. at 98. Second, the vessel is liable for a breach of its "active control duty" if it "actively involves itself in the cargo operations and negligently injures a longshoreman" or "if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Scindia*, 451 U.S. at 167; *see also Howlett*, 512 U.S. at 98. Third, under the "duty to intervene," the shipowner has a duty only if "contract provision, positive law, or custom" dictates "by way of supervision or inspection [that the shipowner] exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." *Scindia*, 451 U.S. at 172 (holding that when no contract, positive law, or custom was alleged, shipowner was not responsible for dangerous condition arising during cargo loading operations); *see also Goldsmith v. Swan Reefer A.S.*, 173 Fed. App'x 983, 986 (3d Cir. 2006) (unpublished opinion) (noting same) (*citing Scindia*, 451 U.S. at 167, 175-79). The parties agree that this case concerns only the turnover duty. (Doc. No. 49-2 ¶ 5.)

The turnover duty encompasses two separate duties: a basic turnover duty, and a corollary duty to warn that applies in certain circumstances. *See Serbin v. Bora Corp.*, 96 F.3d 66, 70 (3d Cir. 1996) ("The turnover duty comprises 'both a duty to provide safe conditions and a corollary duty to warn of known, non-obvious hazards' in instrumentalities and areas 'turned

over' to the stevedore's control." (*quoting Kirsch v. Plovidba*, 971 F.2d 1026, 1028 (3d Cir. 1992))).  The basic turnover duty requires the vessel to

> "exercise ordinary care under the circumstances" to turn over the ship and its equipment and appliances "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care" to carry on cargo operations "with reasonable safety to person and property."

*Howlett*, 512 U.S. at 98 (*quoting Fed. Marine Terminals, Inc., v. Burnside Shipping Co.*, 394 U.S. 404, 416-17 n.18 (1969); *see also Kirsch*, 971 F.2d at 1029 (noting same).  The corollary duty to warn requires the vessel to

> warn the stevedore "of any hazards on the ship or with respect to its equipment," so long as the hazards "are known to the vessel or should be known to it in the exercise of reasonable care," and "would likely be encountered by the stevedore in the course of his cargo operations[,] are not known by the stevedore[,] and would not be obvious to or anticipated by him if reasonably competent in the performance of his work."

*Howlett*, 512 U.S. at 98-99 (*quoting Fed. Marine Terminals*, 394 U.S. at 416 n.18).  Thus, the corollary duty to warn generally extends to known, non-obvious dangers on the vessel and its equipment.[1]  *See Mankus v. Swan Reefer I*, No. 02-3425, 2003 U.S. Dist. LEXIS 10263, at *11 (E.D. Pa. May 20, 2003) (noting same).

"The location of the defect in the cargo stow and cargo area, as opposed to the ship's gear, equipment, tools, and workplace, narrows the vessel's corollary duty to warn."  *DeSantis v. Alder Shipping Co.*, No. 06-1807, 2008 WL 4007506, at *4 (D.N.J. Aug. 8, 2008) (*citing Howlett*, 512 U.S. at 105).  Indeed, the Supreme Court has stated that "[f]or the purposes of

---

[1] The "primary burden" is placed "on the stevedore for avoiding injuries caused by obvious hazards."  *Kirsch*, 971 F.2d at 1029 (*quoting Scindia*, 451 U.S. at 170).  This is because "as a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards."  *Id.*

delineating the scope of a shipowner's turnover duty . . . the cargo stow is separate and distinct from other aspects of the ship." *Howlett*, 512 U.S. at 104.  The distinction exists because Congress intended to place liability for injuries on the party who controls the area where the injuries occurred.  *Id.* at 105.  "[T]he vessel and its crew have direct access to (and control over) the ship itself and its gear, equipment, and tools."  *Id.* at 104.  By contrast, "the vessel does not exercise the same degree of operational control over, and does not have the same access to, the cargo stow."  *Id.*  Accordingly, the vessel's "duties with respect to the stow are limited by comparison."  *Id.*  When the hazard is located in the ship's cargo stow and cargo area, the vessel's duty

> attaches only to latent hazards, defined as hazards that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of his work . . . . [T]he duty encompasses only those hazards that are known to the vessel or should be known to it in the exercise of reasonable care.

*Id.*  "In sum, to trigger a vessel's turnover duty to warn of a defect in the cargo stow[,] a litigant must show that (1) the shipowner had knowledge or should have had knowledge in the exercise of reasonable care of the defect and (2) that the defect would not be obvious to a competent stevedore."  *Frederico v. Guangzhou Ocean Shipping Co.*, No. 96-6231, 1997 WL 634374, at *3 (E.D. Pa. Sept. 29, 1997) (*citing Howlett*, 512 U.S. at 104; *Derr v. Kawasaki Kisen K.K.*, 835 F.2d 490, 496 (3d Cir. 1987)).

### A.      Location of the Defect

Addressing first the question of whether the sling was part of the cargo stow and cargo area or part of the vessel's gear, equipment, tools, and workplace,[2] this classification is

_____

[2] Defendant concedes that the sling was defective.  (*See* Doc. No. 51 at 7.)

significant because "the cargo stow is separate and distinct from other aspects of the ship" and the vessel's obligation under the turnover duty to inspect the cargo area is limited to latent hazards. *Howlett*, 512 U.S. at 104.  In the case of *Mullen v. Alicante Carrier Shipping Corp.*, No. 02-6722, 2004 WL 1737493, at *5 (E.D. Pa. Aug. 3, 2004), the court classified a sling as part of the ship's cargo stow.  In *Mullen*, the plaintiff was removing slings from pallets of bananas that had been loaded aboard a ship when he pulled on a sling that had a knot in it.  *Id.* at *2.  The plaintiff claimed that the sling "got caught as he was pulling it out because there was a knot in it that was not visible before the accident." *Id.*  The plaintiff injured his shoulder as a result of the knot. *Id.*  The court concluded that the sling was part of the ship's cargo stow because "the facts of this case most closely resemble those of *Howlett*." *Id.* at *5.  In *Howlett*, the Supreme Court found that plastic sheeting supplied by the vessel and placed underneath cargo bags was part of the cargo stow. *Id.*  The court in *Mullen* appeared to draw a distinction between apparatuses that are part of the ship and apparatuses that are part of the cargo stow being unloaded. *Id.*  Since the sling was being unloaded, the court concluded that it was cargo. *Id.*

Other courts have drawn this distinction and have looked to whether the apparatus was part of the ship.  For example, the Supreme Court viewed a defective winch used by a stevedore to unload cargo as part of the ship's equipment where the winch was part of the ship's gear. *Scindia*, 451 U.S. at 159.  A court in this District viewed a ship's archway as part of "the general structure of the ship" and distinguished it from the cargo stow. *Prinski v. Blue Star Line Marine, Ltd.*, 341 F. Supp. 2d 511, 517 (E.D. Pa. 2004); *see also Sinagra v. Atl. Ocean Shipping, Ltd.*, 182 F. Supp. 2d 294, 297 n.1 (E.D.N.Y. 2001) (classifying "stacking shoes" – a mechanism placed in the four corners of a shipping container to attach containers together – as equipment

10

rather than cargo).  By contrast, the Third Circuit viewed a coil that was part of the cargo being

unloaded as part of the cargo stow.  *See Derr*, 835 F.2d at 496.  A court in this District viewed

electrical cords extending from refrigerated storage containers that had been improperly tied by

the ship's crew as part of the cargo stow.  *See Mankus*, 2003 U.S. Dist. LEXIS 10263, at *16-17.

Plaintiff and Defendant disagree about the classification of the sling in this case.

Defendant argues that the sling should be classified as part of the cargo stow.  (Doc. No. 12 at 8.)

Defendant relies principally on *Mullen*, 2004 WL 1737493, at *5, in support of this argument.

Defendant asserts that in *Mullen*, "this Court held that the cargo sling should be considered a part

of the cargo, and not a part of the ship."  (Doc. No. 12 at 9.)  Defendant argues that *Mullen* "is

controlling on the issue."  (*Id.* at 8.)

Plaintiff contends that the sling should be classified as equipment based on its function as

a tool.  (Doc. No. 49-2 at 16.)  Plaintiff reasons that "the sole purpose of the . . . slings is to lift

the [cargo]" into and out of the cargo hold, and that the slings "are left draped around the stow as

a convenience and time saving measure so that they can be used as a lifting device during

discharge."  (Doc. No. 49-2 at 18.)  Accordingly, Plaintiff contends that the slings "are no more a

part of the cargo stow than the cargo spreader to which the slings are secured or the cargo crane

which lifts the spreader and the slings."  (Doc. No. 49-2 at 18.)  Plaintiff further contends that

"the risk of harm presented by a defective . . . sling [is] not associated with cargo stowage," and

that the slings are ultimately "returned to the ship and transported by the vessel back to the

loading ports where they are able to be used over and over again as lifting devices for subsequent

stows of [cargo]."  (*Id.*)  Finally, Plaintiff contends that the slings are equipment – or at least not

cargo – because Defendant leases the slings and provides them to the stevedores for repeated use.

(*Id.* at 17.)

Whether the sling was equipment or cargo presents a genuine issue of material fact that a jury should decide.  The sling was used to remove cargo, similar to the vessel's equipment and tools.  *See, e.g.*, *Scindia*, 451 U.S. at 159 (defective winch used to unload cargo was part of the ship's equipment); *Sinagra*, 182 F. Supp. 2d at 297 n.1 ("stacking shoes" used to attach containers together was equipment).  There is evidence that, like the vessel's equipment and tools, the vessel and its crew had the most direct access to and control over the sling.  The vessel leased the sling from a third-party provider.  The vessel thus provided the sling to the stevedores.  The vessel often set aside slings that did not meet its standards.  The stevedores could not access the sling in this case, as it was not visible to anyone upon the opening of the hatches because of its position at the bottom of the cargo hold.  (Doc. No. 12 ¶ 20; Doc. No. 49-1 ¶ 20.)  Moreover, the sling did not cause injury until it was used to lift the cargo.  The risk of harm associated with the sling therefore attached to its use in loading and unloading, not in its capacity as stowed cargo.

There is also evidence that Defendant considered the sling to be the vessel's equipment in its regular operations.  Defendant's internal operating procedures provide that only "tested/certified material and equipment" that has been regularly inspected may be used for loading and unloading the vessel.  (Strijland Dep. 35-36.)  For Defendant's ships that have their own cargo cranes, Defendant owns the slings and inspects them prior to turning them over to the stevedores.  Under the policy, slings that have a small cut that does not penetrate the sling must be repaired before use, while slings that have cuts that fully penetrate the sling must be "condemned" by Defendant's crew.  This policy does not apply to slings that Defendant leases

12

from third parties, like the slings at issue here.  Instead, the third-party lessor was to provide

"inspected slings."  (Bijkerk Dep. 47.)  Defendant's inspection policy with respect to its own

slings and Defendant's lease of "inspected slings" from a third-party are consistent with its

general policy to provide "tested/certified . . . equipment."  These policies are evidence that

Defendant considered the sling to be equipment to be used in the course of its business.

        However, there is also evidence that the sling was part of the stowed cargo.  The sling

was stowed along with the cargo and was not physically attached to the ship, similar to the cargo

itself.  *See, e.g.*, *Derr*, 835 F.2d at 496 (coil stowed with cargo was part of cargo stow); *Mankus*,

2003 U.S. Dist. LEXIS 10263, at *16-17 (electrical cords stowed with refrigerated cargo

containers was part of cargo stow).  The sling was not attached to the ship's crane, gears, or other

components while stowed.  The sling was instead draped over the cargo unit until it was time for

unloading.  It was not until the cargo was being unloaded at the pier that the sling was finally

attached to a crane.  Even then, the sling was not attached to the ship since the *Morraborg* did

not have its own cargo cranes.  (Doc. No. 49-2 at 5.)

        Clearly, there is a dispute concerning the status of the sling as equipment or as part of the

cargo stow.  We cannot conclude, as Defendant would have us do, that as a matter of law the

sling was part of the cargo stow.  A district court reached a similar conclusion and denied

summary judgment in the case of *Hill v. NSB Niederelbe Schiffahrtsges.MBH & Co.*, No. 02-

2713, 2003 WL 23162396, at *6 (E.D. Pa. Dec. 30, 2003).  One of the issues in *Hill* was whether

a vessel's lashing gear was equipment or cargo.  *See id.*  Lashing gear referred to metal rods that

connected the cargo with the vessel and that held the cargo in place during transport.  *Id.* at *1.

The plaintiff alleged that he was injured because of a defect in the lashing gear.  *Id.*  The court

13

found "a genuine issue of material fact as to whether the alleged defect fell within the [d]efendants' turnover duty, as to either the ship's equipment or a latent cargo hazard," because "[t]he evidence presented certainly raise[d] an issue of fact as to whether the lashing gear was the ship's equipment, as all of the lashing gear was provided by the shipowner." *Id.* at *6. The court denied summary judgment because of the genuine issue of material fact "as to whether the alleged defect fell within the [d]efendant's turnover duty, as to either the ship's equipment or a latent cargo hazard." *Id.* at *7. Here, Defendant leased the slings and provided them to the stevedores, like the vessel in *Hill* that provided the lashing gear. Summary judgment was inappropriate in *Hill*. We conclude that it is inappropriate here.[3]

### B.      Breach of the Turnover Duty

#### 1.      Sling as Equipment

Addressing next the question of whether Plaintiff has presented a genuine issue of material fact regarding Defendant's duty to inspect the sling as equipment, we must determine whether a reasonable jury could find that Defendant failed to exercise "ordinary care under the circumstances" to turn over the *Morraborg* and its equipment "in such condition that an expert

---

[3] Defendant also cites *Conenna v. Loyal Chartering Corp.*, No. 98-7402, 2003 WL 255947, at *1 (E.D.N.Y. Feb. 5, 2003), in support of its argument that the slings are cargo rather than equipment. *Conenna* involved "Marino slings" – "the most common method of transporting a cargo of cocoa beans" – which "crisscross[ed] below the bottom and over the top of the bags securing the bags together for stowage and transport." *Id.* The court classified the "Marino slings" as cargo. *Id.* at *7. The court distinguished "Marino slings" from the vessel's lifting straps, which were what the "longshoremen attach to cranes to load and unload the [Marino] slings to and from the vessel." *Id.* at *1. The slings at issue in this case were not "Marino slings." Rather, the slings were used for hoisting similar to the lifting straps in *Conenna*. (*See* Bijkerk Dep. 33 (using general term "slings" to describe what is "hook[ed] on the crane, and load[ed] on the ship"); Erikkson Dep. 29 (explaining that the slings are "manually" connected to the crane "so that they can be lifted").)

14

and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to

encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise

of ordinary care" to carry on cargo operations "with reasonable safety to person and property."

*Howlett*, 512 U.S. at 98.

  Defendant contends that Plaintiff's cause of action "must fail as a matter of law" because

"there is absolutely no evidence that [Defendant] had actual knowledge of the defective sling."

(Doc. No. 12 at 10.)  Defendant contends that it had no duty to inspect the sling to discover

defects because the sling was part of the cargo operations assigned to the stevedore.  (*Id.*)

Defendant argues that it is "entitled to rely on [the stevedore's] professional expertise and

warranties," and that Defendant in fact relied on the stevedore "to inspect the slings as part of its

cargo operations."  (Doc. No. 12 at 11.)  Defendant maintains that its "reliance [on the stevedore]

was reasonable, considering that [the stevedore] maintained custody and control of the slings and

routinely inspected them prior to their use in cargo operations for the safety of [the stevedore]

loading the cargo."  (*Id.*)

  Plaintiff concedes that "the evidence cannot be said to demonstrate that [Defendant] had

actual knowledge of the defective condition of the sling"; however, Plaintiff maintains that

Defendant's actual knowledge is not necessary.  (Doc. No. 49-2 at 21.)  Plaintiff submits that

"there is ample evidence from which a jury may determine that such condition should have been

known to [Defendant] in the exercise of reasonable care."  (*Id.*)  For example, Plaintiff cites

Defendant's internal policy of inspecting slings before use and discarding those which are not

safe; Defendant's practice of inspecting the slings prior to turning them over to a stevedore; and

the International Safety Management Code requirement that slings be "maintained in conformity"

with industry standards.  (*Id.*)  Moreover, Plaintiff contends that a reasonable jury could find that

Defendant did not exercise reasonable care by delegating its inspection duty to a third party,

Locatum, because Defendant (1) did not provide Locatum "with any criteria or standards to

utilize in inspecting and rejecting slings"; (2) did not know whether Locatum had expertise or

skills with regard to inspecting slings; and (3) did not know who was actually inspecting the

slings.  (*Id.* at 21-22.)

Clearly, there is a genuine issue of material fact with regard to Defendant's exercise of

reasonable care.  Defendant's assertion that Plaintiff's claim "must fail as a matter of law"

without evidence that Defendant had "actual knowledge of the defective sling" is simply

incorrect.  (Doc. No. 12 at 10.)  Proof of Defendant's "actual knowledge" of a defect is not

required under the turnover duty of § 5(b).[4]  *See Cole v. Noble Drilling Corp.*, No. 05-0479, 2007

WL 2475944, at *6 (S.D. Miss. Aug. 28, 2007) ("Under this turnover duty, 'there is no

requirement that the vessel have actual knowledge of the danger presented before liability will

attach.'" (*quoting Woods v. Sammisa Co.*, 873 F.2d 842, 851 (5th Cir. 1989))), *aff'd*, 288 Fed.

App'x 931 (5th Cir. 2008).  "All that is required is that the injury that results from the failure to

exercise due care be reasonably foreseeable. . . ."  *Id.* (*quoting Woods*, 873 F.2d at 852).  Indeed,

as the Supreme Court explained in *Howlett*, the turnover duty requires the vessel to "exercise

ordinary care under the circumstances" to turn over the ship and its equipment "in such condition

---

[4] By contrast, the duty to intervene under § 5(b) requires that the shipowner have actual knowledge of the defect and of the stevedore's continuing use of the defective item.  *See, e.g.*, *Serbin*, 96 F.3d at 70 (noting that "the intervention duty requires the ship to take affirmative steps to rectify [certain] hazardous conditions . . . at least when the ship has actual knowledge and the condition is not obvious"); *Singleton v. Guangzhou Ocean Shipping Co.*, 79 F.3d 26, 28 (5th Cir. 1996) (distinguishing the turnover duty from the duty to intervene and noting that the latter requires the vessel's actual knowledge of the defect).  The duty to intervene is not at issue here.

that an . . . experienced stevedoring contractor . . . will be able by the exercise of ordinary care"

to carry on cargo operations "with reasonable safety to person and property."  512 U.S. at 98.

A reasonable jury could conclude that the defective sling was a hazard, that it was

"neither obvious to nor anticipated by a skilled stevedore in the competent performance of his

work," and that it was "known to the vessel or should [have been] known to it in the exercise of

reasonable care."  *Howlett*, 512 U.S. at 104.  After the *Morraborg* was unloaded in Philadelphia,

Defendant's crew joined the stevedores in examining the slings and determined that twenty

percent of the slings had to be discarded as unfit for use.  (Kuursta Dep. 58.)  Defendant

recognized that this was an "extraordinarily high amount of slings" needing to be discarded.[5]  (*Id.*

at 58-59.)  The sling at issue had multiple "obvious" sites of abrasion and edge damage.  The

sling was "old and well worn" and had multiple abrasions, unravelings, and edge damage.  (*See*

Erb Report 4.)  Plaintiff's expert concluded that the edge damage and abrasive damage on the

sling preexisted the failure and would have been "readily visible" during an inspection of the

sling before the accident.  (*Id.*)  Its condition was "obvious."  (*Id.* at 6.)  The standards-specified

label was also missing from the sling.  (*Id.* at 4.)  As part of its general accounting process,

Defendant looked at the slings to "see what kind of condition [the slings] are in."  (Kuursta Dep.

31.)  A reasonable jury could find that Defendant should have known of the sling's condition in

the exercise of reasonable care during the accounting.

Defendant does not necessarily escape liability by relying on its delegation of inspection

duties to a third-party.  There is a fact issue concerning whether Defendant delegated its

---

[5] By comparison, the *Morraborg*'s crew discarded 12 of the 822 slings – less than two
percent – as unfit for use in the voyage immediately prior to the voyage to Philadelphia.  (Kuustra
Dep. 41.)

17

inspection duties with the clarity and authority reasonably required to enable their reliable

discharge.  After the accident, Defendant requested a certificate from the third-party lessor of the

slings certifying that the 468 slings on the *Morraborg* had been inspected prior to use.  (Bijkerk

Dep. 53.)  The certificate indicated that the slings were examined "according to the Rules for

Continuous Supervision of Lifting Appliances."  (*See* Doc. No. 50, Ex. 2 (Certificate dated Sept.

9, 2002).)  Neither Defendant's fleet manager, nor its broker in charge of leasing the slings, nor

its captain knew what these Rules required or referred to.  (*See* Kuurst Dep. 20 ("I don't know

the content of the rules."); Bijkerk Dep. 54 ("Q:  So you don't know what rules they are talking

about correct?  A:  Not in this case."); Strijland Dep. 42 ("Q:  Do you have any understanding or

have you ever heard of the rules for continuous supervision of lifting appliances?  A:  No.").)

Defendant's fleet manager, Robert Strijland, testified that Defendant should have known what

the Rules were if Defendant was going to receive a certificate of compliance with them.

(Strijland Dep. 43.)

 Defendant is also incorrect in arguing that it is relieved of liability as a matter of law

because it relied on the stevedore to correct the slings.  (*See* Doc. No. 12 at 11 (arguing that

Defendant is "entitled to rely on [the stevedore's] professional expertise and warranties").)  "The

shipowner is not relieved of liability as a matter of law simply because it relied on the stevedore

to correct the condition . . . or because it relied on the stevedore's judgment to proceed with the

work in spite of the condition."  *Moore v. M.P. Howlett, Inc.*, 704 F.2d 39, 42 (2d Cir. 1983)

(citations omitted); *see also Evans v. Transportacion Maritime Mexicana*, 639 F.2d 848, 856 (2d

Cir. 1981) ("Ordinarily, a ship should be entitled to rely on its stevedore to perform its job in a

safe and workmanlike fashion.  But we cannot hold that whenever control is relinquished to the

stevedore, the shipowner may, as a matter of law, 'rely' on the stevedore.").  Courts have held

that "[i]n such circumstances the question whether the owner's actions were negligent or not was

for the jury to decide."  *Moore*, 704 F.2d at 42 (citations omitted).

      Finally, it is not dispositive that many of the snags and other damage to the sling were

plainly visible after the accident.[6]  *See Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1246

(5th Cir. 1997) (no breach of turnover duty if defect causing the injury is "open and obvious" and

one that "longshoremen should have seen").  "The Third Circuit has clearly held that whether a

defect is obvious is generally a question for the jury, and not appropriately decided on a motion

for summary judgment."  *Hill*, 2003 WL 23162396, at *4 (*citing Serbin*, 96 F.3d at 73; *Davis v.

Portline Transportes Maritime Internacional*, 16 F.3d 532, 540 (3d Cir. 1994)).  *Cf. Jackson v.

Egyptian Navigation Co.*, 364 F.3d 113, 118 (3d Cir. 2004) (affirming grant of summary

judgment where the "evidence is unequivocal that the [defect's] presence and placement

presented an obvious danger and hazard to the safety of a longshoreman unloading the cargo,

which the stevedore should and could have corrected and for which the shipowner was not

liable"); *Quevedo v. Trans-Pacific Shipping, Inc.*, 143 F.3d 1255, 1259 (9th Cir. 1998) (noting

that an expert stevedore would have noticed defective slings "because the loads of pipe . . . were

unstable and not held tightly together" and thus affirming trial court's conclusion that owner had

no turnover duty to warn longshoreman of alleged unstable condition of cargo loads).  Moreover,

the open and obvious nature of the hazard "is not sufficient to preclude a shipowner's potential

liability," *Toups v. Marine Transp. Servs., Inc.*, No. 99-2481, 2000 WL 1159392, at *4 (E.D. La.

---

      [6] Immediately before the accident, the sling at issue was largely hidden from view under
the pallet at the bottom of the cargo stow.

Aug. 15, 2000), because "[a] vessel owner remains liable if a longshoreman's only alternatives to the open and obvious hazard are unduly impracticable or time-consuming," *Greenwood*, 111 F.3d at 1248; *see also Manuel v. Cameron Offshore Boats, Inc.*, 103 F.3d 31, 34 (5th Cir. 1997) ("We have long held that when an independent contractor has actual knowledge of a remediable hazardous condition the vessel owner's turnover duty is not implicated unless the contractor's 'only alternative would be to leave his job or face trouble for delaying work.'" (*quoting Morris v. Compagnie Maritime Des Chargeurs Reunis, S.A.*, 832 F.2d 67, 70 (5th Cir. 1987))).

   2. *Sling as Cargo*

  Addressing finally the question of whether Plaintiff has presented a genuine issue of material fact regarding Defendant's duty to inspect the sling as part of the cargo stow, we are satisfied that there remains a dispute of material fact concerning whether Defendant breached its turnover duty as to a latent cargo hazard. *See, e.g.*, *Hill*, 2003 WL 23162396, at *7 (noting that "there is, at a minimum, a genuine issue of material fact as to whether the alleged defect fell within the [d]efendant's turnover duty, as to either the ship's equipment *or as a latent cargo hazard*") (emphasis added). A hidden defect in this context is a hazard "that would be neither obvious to nor anticipated by a competent stevedore in the ordinary course of cargo operations." *Howlett*, 512 U.S. at 99. The turnover duty to warn "is confined to latent hazards that 'are known to the vessel or should be known to it in the exercise of reasonable care.'" *Id.* at 99-100 (*quoting Scindia*, 451 U.S. at 167).

  For the reasons discussed above in the context of the turnover duty to inspect equipment, a reasonable jury could find that Defendant should have known of the hazard associated with the sling in the exercise of reasonable care. *See Howlett*, 512 U.S. at 105. Defendant accounted for

the slings after each voyage and made visual inspections.  Defendant leased the slings from a

third party without providing any criteria to govern their inspection.  The sling at issue had

multiple abrasions and defects that, a reasonable jury could find, would be obvious to the vessel

during the accounting.  The defect would not necessarily be obvious to or anticipated by a

competent stevedore in the ordinary course of cargo operations, because there is evidence that

this particular sling – and its defects – were largely hidden during cargo operations.

**IV.**    **CONCLUSION**

For these reasons, Defendant's motion for summary judgment will be denied.

An appropriate Order will follow.

BY THE COURT:

_____

R. Barclay Surrick, J.

21