

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT REVAK and<br>MARGARET REVAK | :<br>:<br>: |
| v. | : CIVIL ACTION<br>:<br>: NO. 03-4822 |
| INTERFOREST TERMINAL UMEA AB<br>and WAGENBORG SHIPPING, B.V. | :<br>: |

SURRICK, J.                                                                                  MAY __, 2009

## MEMORANDUM

Presently before the Court is Defendant Interforest Terminal UMEA AB's Motion for Summary Judgment (Doc. No. 46). For the following reasons, the Motion will be denied.

### I. BACKGROUND

Robert Revak ("Plaintiff") worked as a longshoreman at a shipping terminal in the Port of Philadelphia. Plaintiff and his wife, Margaret Revak, brought this general maritime negligence action after he was injured by a draft of timber that fell on him as a result of a broken sling as the timber was being unloaded from the cargo-hold of a ship. Wagenborg Shipping, B.V., owned and operated the cargo ship, the *Morraborg*, from which the timber fell. Interforest Terminal UMEA AB ("Defendant") loaded the *Morraborg* with the timber during the course of its stevedoring services. The following facts leading up to the accident are drawn in the light most favorable to Plaintiff as the nonmoving party.[1]

#### A. Loading of the *Morraborg* in Sweden

On August 23, 2002, Defendant loaded the *Morraborg* with packages of sawn timber at a

---

[1] Many of these facts have been recited in a May 14, 2009 Memorandum denying the motion for summary judgment of Wagenborg Shipping, B.V. (*See* Doc. No. 54.)

shipping terminal in Holmsund, Sweden, for transport to Philadelphia. (Doc. No. 48-1 ¶ 4; Doc. No. 46-1 ¶ 4.) The sawn timber had been organized into lifting units called "drafts." (Doc. No. 48-1 ¶ 18; Doc. No. 46-1 ¶ 18.) In order to hoist the drafts from the pier and into the cargo hold, Defendant used polyester slings that were wrapped around each draft and then attached to the hook of a cargo crane. (Doc. No. 48-1 ¶ 5; Doc. No. 46-1 ¶ 5.) Defendant used two slings per draft, for a total of 468 slings. (Kuursta Dep. 58.) The slings that Defendant used to load the *Morraborg* were leased by Wagenborg Shipping from Locatum, a Swedish company in the business of supplying cargo slings to the maritime industry. (Doc. No. 48-1 ¶¶ 6, 8; Doc. No. 12 ¶ 9; Doc. No. 49 ¶ 9.) Locatum was supposed to deliver slings that were "inspected." (Bijkerk Dep. 51.)

Notwithstanding Locatum's delivery of "inspected" slings, Defendant generally inspects the slings prior to loading them aboard a vessel. Defendant first inspects the slings as they are sorted and bundled into bunches of ten for transport from the terminal to the ship. (Erikkson Dep. 18-20.) Defendant next inspects the slings at the pier as the bundles are opened and unfolded. (*Id.* at 19.) Defendant finally inspects the slings as they are wrapped around the cargo pallets. (*Id.* at 23-24.) Defendant's foreman testified that during these inspections, the longshoremen "should search . . . for various types of mechanical damage." (*Id.* at 22; Häggkvist Dep. 12.) Defendant's foreman "also inspect[s] on an ongoing basis when there is a need for it" by "having a brief look at [the slings]." (Erikkson Dep. 22.) All of these inspections involve a visual scan of the slings; Defendant's longshoremen do not slide the slings through their hands to look at every centimeter on both sides. (*Id.* at 23.) After a voyage, Defendant again inspects the slings. (Häggkvist Dep. 25.) If any slings are of "deficient quality" or "ha[ve] damage on them,"

Defendant discards the slings by placing them in the garbage. (*Id.* at 25, 27.) Otherwise, the slings can be returned to the inventory and used again on another voyage. (Erikkson Dep. 46-47.)

Defendant does not provide its longshoremen with any written instructions or guidelines on how to perform these inspections. (*See* Johannson Dep. 27 ("Q: Have you ever received any written instructions or guidelines regarding the proper way of inspecting a sling? A: No, I haven't."); Ogren Dep. 5 ("Q: [H]ave you ever received any instruction or training on how to properly inspect a sling? A: No.").) With regard to sling inspection, Defendant provides only on-the-job advice from more experienced longshoremen and not any written instruction or training:

> Q: So how did you learn how to inspect a sling?
> A: Well, through other colleagues and from foremen. It's a part of the process.
> Q: Did you ever receive anything in writing that instructed you on the proper way of inspecting a sling and what type of conditions you should look for in determining whether to reject a sling?
> A: No.
> Q: Did you ever see any pictures at Interforest Terminal that showed you the types of slings that should be discarded or rejected?
> A: No.
> Q: So your knowledge regarding the proper way of inspecting a sling and what to look for, what conditions to look for in determining whether to accept it or reject it, comes from what you were told by foremen and your on-the-job experience. Is that fair to say?
> A: Yes.

(Ogren Dep. 6; *see also* Johansson Dep. 32 ("[I]t was only one foreman who went over [the instructions] with me.").) Defendant does not provide written criteria or standards even though it would be "good" and "easier for everyone" if such standards were in place:

> Q: Do you think it would be helpful to you on your job if you were given

3

>       written criteria or standards to follow in determining whether or not
>       to reject a sling?
> A:    Naturally, I would find it good if there were such. It would be easier
>       for everyone.

(Ogren Dep. 11.)

### B. The *Morraborg*'s Arrival in Philadelphia

Once Defendant finished loading the timber into the cargo hold of the *Morraborg* in Sweden, the ship had an uneventful trans-Atlantic voyage and arrived at the port of Philadelphia on September 8, 2002. (Doc. No. 48-1 ¶ 14; Doc. No. 46-1 ¶ 14.) Plaintiff and other employees of the J&H Stevedoring Company – not a Defendant in this case -- began unloading the drafts. (*Id.*) Plaintiff's job was to assist in turning the drafts as they were being placed on the pier in Philadelphia so that forklift trucks could move the drafts into a nearby warehouse. (Pl.'s Dep. 52; Doc. No. 48-1 ¶ 17; Doc. No. 46-1 ¶ 17.) As the stevedores were hoisting one of the drafts from the vessel's cargo hold and onto the pier, one of the polyester slings parted and spilled the draft onto Plaintiff, who was standing on the pier. (Doc. No. 48-1 ¶ 19; Doc. No. 46-1 ¶ 19.) Plaintiff was severely injured and has been unable to work since the accident.

### C. Condition of the Sling after the Accident

Robert A. Erb, Ph.D., a materials scientist and Plaintiff's expert, examined the sling after the accident. (*See* Doc. No. 50, Ex. 35, at 5 (hereinafter, "Erb Report").) The sling was "old and well worn" and had multiple abrasions, unravelings, and edge damage. (*Id.* at 4.) The expert concluded that the edge damage and abrasive damage on the sling preexisted the failure and would have been "readily visible" during an inspection of the sling before the accident. (*Id.*) The standards-specified label was also missing from the sling. (*Id.*) The expert evaluated the

4

fibers that extended toward the break on the sling and concluded that "there was damage to the fabric in that area prior to the failure." (*Id.* at 5.) Captain Bijkert, the Master of the *Morraborg* at the time of the accident, saw photographs of the sling during his deposition. Bijkert testified that if he had seen the conditions of the sling shown in the photographs, he "should have refused it because there's a broken part on it." (Bijkert Dep. 145.) The condition of the sling was "obvious." (Erb Report 6.)

Of the 468 slings that were loaded onto the *Morraborg*, 84 of them – or twenty percent – were determined to be unfit for use after the voyage. (Kuusta Dep. 58.) This was an "extraordinarily high amount of slings" needing to be discarded. (*Id.* at 58-59.) By comparison, 12 of the 822 slings – less than two percent – were determined to be unfit for use after the voyage immediately prior to the voyage to Philadelphia. (*Id.* at 41.)

### D. Plaintiff Files Complaints

On August 23, 2003, Plaintiff filed a civil action alleging negligence against Defendant and Locatum. (*See* Doc. No. 1.) Plaintiff's claims against Locatum were dismissed for lack of personal jurisdiction. (*See* Doc. No. 36.) On September 4, 2004, Plaintiff filed a separate action for negligence against Wagenborg Shipping, B.V. *See* Compl., *Revak v. Wagenborg Shipping, B.V.*, Case No. 04-4253 (E.D. Pa. Sept. 4, 2004). The actions against Defendant and Wagenborg Shipping, B.V., were consolidated on April 6, 2005. (*See* Doc. No. 35.) Wagenborg Shipping, B.V., filed a motion for summary judgment, and that motion was denied on May 14, 2009. (*See* Doc. Nos. 54, 55.) Defendant filed the instant Motion for Summary Judgment, which is now ripe for resolution.

II.   **LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of demonstrating that there are no facts supporting the nonmoving party's legal position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (explaining that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The nonmoving party "cannot 'rely merely upon bare assertions, conclusory allegations or suspicions' to support its claim." *Fin. Software Sys., Inc., v. Lecocq*, No. 07-3034, 2008 WL 2221903, at *2 (E.D. Pa. May 29, 2008) (quoting *Fireman's Ins. Co. v. DeFresne*, 676 F.2d 965, 969 (3d Cir. 1982)). Rather, the party opposing summary judgment must go beyond the pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. When deciding a motion for summary judgment, we must view facts and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Siegel Transfer, Inc., v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995). We must not resolve factual disputes or make credibility determinations. *Siegel Transfer*, 54 F.3d at 1127.

## III.   DISCUSSION

Plaintiff argues that his claim arises "under the general maritime law of negligence."[2] (Doc. No. 48-2 at 2.)  The law applicable to Plaintiff's negligence claim depends on whether this case sounds in admiralty.  *See Gibbs ex rel. Gibbs v. Carnival Cruise Lines*, 314 F.3d 125, 131 (3d. Cir. 2002) ("[I]f the case sounds in admiralty, it would be inappropriate to apply New Jersey law or any other state's law, instead of federal admiralty law."); *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 73 (3d Cir. 1996) ("Substantive maritime law applies to a cause of action brought in admiralty." (citing *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986))).  The parties do not dispute that admiralty jurisdiction is proper and that general maritime law applies to Plaintiff's negligence claim.  (*See* Doc. No. 48-2 at 12 n.10.)

### A.   Admiralty Jurisdiction

"The district courts shall have original jurisdiction, exclusive of the courts of the States, of [a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."  28 U.S.C. § 1333(1).  A claim falls within the court's admiralty jurisdiction if it satisfies two elements:  location and connection.  *Jerome B. Grubart, Inc., v. Great Lakes Dredge Dock Co.*, 513 U.S. 527, 534 (1995).  Under the location test, "the incident must have 'occurred on navigable water or . . . [be an] injury suffered on land [that] was caused by a vessel on navigable water.'"  *Gibbs*, 314 F.3d at 131 *(quoting Grubart,*

---

[2] In his Second Amended Complaint, Plaintiff asserts that "[j]urisdiction arises under the admiralty and maritime jurisdiction of this court."  (Second Am. Compl., Doc. No. 20 ¶ 6). Plaintiff later asserts in his summary judgment briefing that "[j]urisdiction is based on 28 U.S.C. § 1332, there being diversity of citizenship between the parties."  (Doc. No. 48-2 at 2.) Plaintiff's summary judgment briefing is not a pleading, and Plaintiff does not invoke diversity jurisdiction in the Second Amended Complaint.  (*Id.*)

513 U.S. at 534) (alteration in original). Under the connection test, the court must

> first . . . assess the general features of the type of incident involved, to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.

*Grubart*, 513 U.S. at 534 (internal quotations omitted); *see also Gibbs*, 314 F.3d at 131 (listing the two issues raised by the connection test as separate elements of the admiralty jurisdiction inquiry).

Here, Plaintiff suffered an injury on land (at the pier) that was caused by the unloading of the *Morraborg* as it was docked on navigable water. The location test is easily satisfied. The connection test is also satisfied. Injuries sustained by a longshoreman unloading a vessel on a pier have the potential to disrupt maritime commerce. The general character of the activity giving rise to the incident in this case also bears a substantial relationship to traditional maritime activity. *See Gibbs*, 314 F.3d at 132 (holding that negligence claims based on injuries to a passenger on a cruise ship bore a substantial relationship to traditional maritime activity); *Gross v. Tonomo Marine*, No. 02-1317, 2004 WL 2093457, at *1 (W.D. Pa. May 25, 2004) (noting that "the unloading of a vessel is an activity integral to . . . maritime commerce"). This matter falls within this Court's admiralty jurisdiction.[3] *See, e.g., Goldsmith v. Swan Reefer A.S.*, 173 Fed.

---

[3] It is not fatal to admiralty jurisdiction that the crane hoisting the broken sling was detached from the vessel, since it was the sling – i.e., equipment or cargo of the ship stored on board – that caused the injury. *See, e.g., Hagans v. Ellerman & Bucknall S.S. Co.*, 318 F.2d 563, 565 (3d Cir. 1963) (finding that maritime law applied to tort claim arising when longshoreman slipped on the pier on sand from bags that he was unloading); *Mullen v. Alicante Carrier Shipping Corp.*, No. 02-6722, 2004 WL 2203723, at *2 (E.D. Pa. Sept. 24, 2004) (observing that "for jurisdictional purposes, the injury appears to have been 'caused' by a vessel on navigable waters, in that the injury was caused by the cargo slings in a vessel's cargo hold soon after the vessel docked and during the process of unloading"); *Hamburg Amerika Linie v. Gulf Puerto Rico Lines, Inc.*, 429 F. Supp. 707, 709 (D.P.R. 1977) (finding maritime jurisdiction since the

App'x 983, 988 (3d Cir. 2006) (unpublished opinion) (holding that "[t]he District Court was correct in applying federal maritime tort law to this claim, because the accident satisfied the [*Grubart* criteria]: (1) it occurred on navigable water, (2) it bore a 'substantial relationship to traditional maritime activity,' and (3) it had 'a potentially disruptive impact on maritime commerce'" (quoting *Grubart*, 513 U.S. at 534)), *cert. denied*, 549 U.S. 826 (2006). Accordingly, we will apply negligence principles to Plaintiff's claim under federal maritime law.

### B.     Negligence under Federal Maritime Law

The duties of Defendant, the loading stevedore, with respect to Plaintiff are not limited to the duties discussed in our May 14, 2009 Memorandum Opinion and described in *Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156 (1981), since Defendant is not a "vessel" under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b). Defendant's duties to Plaintiff are instead governed by general negligence standards under federal maritime law. *See, e.g., Mullen*, 2004 WL 2203723, at *3 (noting that the duties of a terminal operator are not limited by *Scindia* and instead "are governed by general negligence standards under maritime law"). "Under general federal maritime law, negligence is an actionable wrong." *Galentine v. Estate of Stekervetz*, 273 F. Supp. 2d 538, 544 (D. Del. 2003) (citing *Leathers v. Blessing*, 105 U.S. 626 (1882)). The general maritime negligence standard is "the duty of exercising reasonable care under the circumstances of each case." *Goldsmith*, 173 Fed. App'x at 988-89

---

injury to the longshoreman occurred on dock as a result of improperly stowed cargo on board, which was connected directly to the conduct of the ship), *rev'd on other grounds*, 579 F.2d 115 (1st Cir. 1978). *Cf. Victory Carriers, Inc., v. Law*, 404 U.S. 202, 209 (1971) (finding no admiralty jurisdiction where "the typical elements of a maritime cause of action [were] particularly attenuated," including that the plaintiff was not injured by the ship's equipment or gear stored on board, the equipment that injured him was not attached to the ship, and the accident did not occur aboard the ship).

(quoting *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 632 (1959)); *see also DeSantis v. Alder Shipping Co.*, No. 06-1807, 2008 WL 4007506, at *8 (D.N.J. Aug. 8, 2008) (noting same) (citations omitted).

In order to prevail on a claim of maritime negligence, a plaintiff must prove that there was: "(1) a duty of care which obliges the person to conform to a certain standard of conduct; (2) a breach of that duty; (3) a reasonably close causal connection between the offending conduct and the resulting injury; and (4) actual loss, injury, or damages suffered by the plaintiff." *Galentine*, 273 F. Supp. 2d at 544 (*citing* 1 Thomas Schoenbaum, Admiralty and Maritime Law § 5-2 at 170 (3d ed. 2001)); *see also VA Int'l Terminals, Inc., v. M/V Katsuragi*, 263 F. Supp. 2d 1025, 1035 (E.D. Va. 2003) (noting same elements). Causation in maritime law, as in general tort law, requires the party alleging negligence to demonstrate both factual and proximate causation. *Galentine*, 273 F. Supp. 2d at 548. "Factual causation involves an inquiry into whether the event would have occurred in the absence of an act or omission. Proximate causation involves an inquiry into whether the damage was a reasonably foreseeable consequence." *Id.* (internal citation omitted). The negligence must be a "substantial factor" in causing the injury, defined as "something more than 'but for' causation." *Thomas v. Express Boat Co.*, 739 F.2d 444, 448 (5th Cir. 1985).

Plaintiff contends that because the slings were in Defendant's control and because Defendant was responsible for inspecting them, Defendant breached a duty of reasonable care by allowing a defective sling to be used in loading the cargo into the *Morraborg*. (*See* Doc. No. 48-2 at 3.) Defendant asserts that there is no evidence that it did not properly inspect the sling at issue because the slings "would have been inspected at least three times" by its stevedores. (*See*

Doc. No. 46-1 at 14-15.) Defendant further asserts that it is in the interest of its loading stevedores to make sure that the slings are not defective because they would be exposing themselves to a potential hazard if they allowed a defective sling to be used in loading the cargo. (*Id.* at 13-14.) Finally, Defendant asserts that the loading stevedores are responsible only for loading cargo in such a way that an experienced stevedore will be able to discharge it with "reasonable safety by exercising reasonable care." (*Id.* (citing *Couch v. Cro-Marine Transp., Inc.*, 44 F.3d 319 (5th Cir. 1995).) Defendant submits that its "obligations end" after loading the cargo. (Doc. No. 46-1 at 13; Doc. No. 52 at 2.)

The fact that Defendant's general practice was to inspect slings at least three times does not necessarily mean that Defendant inspected the particular sling at issue. Plaintiff points to evidence suggesting that this particular sling was not inspected or was inadequately inspected. Plaintiff's expert concluded that the edge damage and abrasive damage on the sling preexisted the failure and would have been "readily visible" during an inspection of the sling before the accident. (Erb Report 4.) The sling was "old and well worn" and had multiple abrasions, unravelings, and edge damage. (*Id.*) Twenty percent of the slings that Defendant loaded onto the *Morraborg* – an "extraordinarily high amount of slings" – were determined to be unfit for use after the voyage to Philadelphia. (Kuusta Dep. 58-59.) This evidence suggests that Defendant's inspections, if they occurred, were inadequate to identify damage to the slings that was "readily visible." There is also evidence that Defendant did not provide the loading stevedores with written instructions or guidelines on how to inspect slings properly. (*See* Johannson Dep. 27; Ogren Dep. 5.) The standards would have made it "easier for everyone" to perform the inspections. (Ogren Dep. 11.) A reasonable jury could attribute the inadequate inspections to

11

Defendant's own lack of written instructions and standards. This evidence, taken together, creates an issue of material fact as to whether Defendant breached its duty of care to Plaintiff.

We agree that Defendant exposed its loading stevedores to the same defective sling that allegedly injured Plaintiff. However, Defendant cannot escape liability to the unloading stevedores as a matter of law merely because it exposed its loading stevedores to the same risk of harm. A risk of harm may give rise to liability to multiple plaintiffs at different points in time. Defendant's liability to Plaintiff for his injury is not mutually exclusive of Defendant's liability to others, even to its own loading stevedores.[4] Indeed, Defendant's duty to exercise reasonable care under the circumstances extends to those whose injury was reasonably foreseeable by the breach. *See, e.g., Galentine*, 273 F. Supp. 2d at 548 (describing proximate causation as "an inquiry into whether the damage was a reasonably foreseeable consequence"). Here, Defendant had to have known that the cargo that its stevedores were loading into the *Morraborg* would eventually be unloaded. Defendant concedes that its loading stevedores exercised "primary control [over] the details of cargo operations." (Doc. No. 46-1 at 14.) A reasonable jury could find that Plaintiff's injuries were a foreseeable consequence of Defendant's use of the defective sling.[5]

---

[4] The remedies, of course, would be different. *See* 33 U.S.C. § 903(a) (establishing workers' compensation benefits for longshoremen injured in work-related accidents regardless of fault).

[5] Defendant would have us adopt the Fifth Circuit standard that "a loading stevedore must load the cargo so that an expert and experienced stevedore will be able to discharge the cargo with reasonable safety by exercising reasonable care." *Couch*, 44 F.3d at 327 (*citing Fed. Marine Terminals, Inc., v. Burnside Shipping Co.*, 394 U.S. 404, 414-15 (1969)). The Third Circuit in the unpublished *Goldsmith* opinion, 173 Fed. App'x at 988-89, and the district courts in *Mullen*, 2004 WL 2203723, at *3, and *DeSantis*, 2008 WL 4007506, at *8, applied a more general duty of "reasonable care under the circumstances." As the Fifth Circuit observed in

Defendant would have us draw a line and conclude that its "obligations end" once it finished loading the cargo. Defendant's obligation to load the cargo may have ended, but its obligation to Plaintiff turns on proximate causation. Proximate causation is governed by the foreseeability of the harm, not by the timing of Defendant's loading of the *Morraborg* with timber.

## IV.    CONCLUSION

There is evidence from which a reasonable jury could find that Defendant acted negligently by allowing the defective sling to be loaded onto the *Morraborg*. Defendant's Motion for Summary Judgment will therefore be denied.

An appropriate Order will follow.

BY THE COURT:

R. Barclay Surrick, J.

---

*Couch*, "[t]he phrase 'reasonable care under the circumstances' is merely a way of paraphrasing the applicable standard of care." 44 F.3d at 327 n.9. Under the wording of either standard, there is a genuine issue of material fact with regard to Defendant's inspection of the broken sling.