FREEDMAN AND LORRY, P.C.
BY: STANLEY B. GRUBER, ESQUIRE
IDENTIFICATION NO.: 22954
1601 Market Street, Second Floor
Philadelphia, PA 19103
(216) 925-8400
Attorneys for Plaintiff

---

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT REVAK and<br>MARGARET REVAK,<br>   Plaintiffs<br> v.<br><br>INTERFOREST TERMINAL<br>UMEA AB<br><br> and<br><br>WAGENBORG SHIPPING B.V.,<br>   Defendants | CIVIL ACTION<br><br><br><br>NO. 03-4822 |

**PLAINTIFFS' MOTION IN LIMINE TO
PRECLUDE OPINION TESTIMONY OF DEFENDANTS' LIABILITY
EXPERT, DAVID P. POPE, PH.D.**

Plaintiffs Robert and Margaret Revak, by their attorneys, Stanley B. Gruber, Esquire and Freedman & Lorry, P.C., move to preclude opinion testimony of Defendants' liability expert, David P. Pope, Ph.D. and in support thereof aver as follows:

  1.  Plaintiffs, Robert and Margaret Revak, seek damages from Defendants Interforest Terminal Umea AB ("Interforest") and Wagenborg Shipping BV ("Wagenborg") as a result of personal injuries suffered by Mr. Revak on September 8, 2002, while employed as a longshoreman assisting in the discharge of units of lumber from the M/V "Morraborg", a vessel owned by Wagenborg, which was berthed at Pier 80 in the Port of Philadelphia. The units of lumber had been stowed aboard the "Morraborg" by Interforest, a Swedish Stevedore, in August 2002, while the ship was berthed at Interforest's shipping terminal in Holmsund, Sweden

2. Plaintiffs contend that Defendant Wagenborg breached its "turnover duty" to Mr. Revak under Section 5(b) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §905(b), by failing to inspect the cargo sling which failed in this case, delegating its duty to inspect to Defendant Interforest, without providing Interforest any guidelines on how to properly conduct such an inspection in accordance with appropriate Standards and without any understanding as to how Interforest would go about making such inspection, and turning its vessel over to Mr. Revak's stevedore employer with the defective sling in place.

3. Plaintiffs contend that Defendant Interforest breached the duty imposed on it under the General Maritime Law of exercising reasonable care under the circumstances by failing to properly inspect the sling before placing it around a draft of lumber, failing to provide any guidance or instruction on the proper manner of inspection of such slings to those of its employees who were charged with that responsibility, and failing to take the sling out of service in light of visible edge and other damage, and a missing label - conditions which precluded use of the sling under appropriate International Standards.

4. It is undisputed that at about 4:30 p.m. on September 8, 2002, the sling in question failed, causing the draft of lumber that it was lifting to fan out like a deck of cards and fall on top of Mr. Revak.

5. Appended hereto as Exhibit 1 is the expert report of Robert A. Erb, Ph.D. Based upon his examination of the sling and his review of the materials referenced in his report, Dr. Erb opined as follows with regard to the cause of the failure of the sling (page 5):

> "Enclosure 5 shows the sling on both sides of the failure site. The process of pulling apart began on the side next to the millimeter ruler. Short fibers extended toward the break on that half of the sling. This indicates that there was damage to the fabric in that area prior to the failure. As a consequence, elongation before rupture was reduced in that area. With the failure of one-half of the sling, the remaining portion came under increasing tensile stress as it supported the load of lumber.

> The next section then began to fail, leaving longer fibers protruding at the break. Then finally the entire load was "hanging by a thread," the long strand at the edge, which finally broke.
>
> An examination of the areas of the sling near the break supports this failure mode. The failure site exhibits *both* edge damage and abrasive damage to the face. The edge area adjacent to 6.2 on the ruler is discolored and is degraded to the point that the multifilament threads have lost their form. Further away from the ruler there continues to be damage to the face of the sling.
>
> The defects shown on Enclosures 1 through 5 are types that would have been readily visible during a reasonable inspection of the sling prior to the accident."

6.  At pages 4 and 6 of his report, Dr. Erb notes that the "The standards-specified label was missing" (Page 4) when he examined the sling and that the sling "clearly lacked its label and legible markings" (Page 6.)

7.  At page 8 of his report, Dr. Erb goes on to quote from the European Standard in effect in 2002 for endless polyester woven slings (E.N. 1492-1:2000). As noted by Dr. Erb, Section 7 of that Standard provides that each sling shall be marked with certain information "both legibly and indelibly, on a durable label fixed directly onto the webbing", with information including the working load limit, the material of the webbing, the manufacturer's name and the traceability code, along with the number and relevant part of the European Standard in question. As noted at Page 10 of Dr. Erb's report, the European Standard in question goes on to note at D.2.3 that in the course of inspection of such a sling "…if any of the required markings have been lost or become illegible, the sling should be removed from service for examination by a competent person.[1]

---

[1] Similarly, at Page 11 of his report, Dr. Erb references the American Society of Mechanical Engineers' Standards for synthetic webbing slings, and, specifically, Section 9-5.8.4 which provides that "a sling shall be removed from service if damage such as the following is visible…

    a.    Missing or illegible sling identification…"

3

8. Defendants have indicated that they intend to call David P. Pope, Ph.D., as a Materials Science Expert in this case. Appended hereto as Exhibit 2 is a copy of Dr. Pope's report dated November 26, 2006.

9. Page 1 of Dr. Pope's report itemizes the materials that he examined or reviewed in connection with his investigation in this case. Those items include the subject sling, Dr. Erb's report, the pleadings, copies of photographs supplied by defense counsel, and the depositions of several of the witnesses in this case, including, Mr. Revak, and the Captain and Chief Officer of the M/V Morraborg. Dr. Pope does not indicate that he reviewed the deposition of Fran Henderson, the operator of the crane that lifted the load in question.

10. At page 1 of his report, Dr. Pope describes his assignment as follows:

> "Mr. Revak was injured by a bundle of lumber that fell on him when an endless polyester lifting sling failed. You asked me to determine, if possible, why the sling failed."

11. At page 3 of his report, Dr. Pope opines that the damage to the sling which caused it to fail "occurred during the lift itself, i.e., the draft pinched the sling against a portion of the ship while it was being lifted from the ship in Philadelphia."

12. Dr. Pope goes on to conclude at page 3 of his report:

> "In summary, I conclude the following to a reasonable degree of engineering certainty: The subject sling was damaged and its load bearing capacity was reduced by at least 80% while the draft was being lifted from the ship in Philadelphia. The remaining segment of the damaged sling could just carry the dead load of the draft, but a small increase in the load, as caused by moving the load as it was being positioned above the dock, was sufficient to break that remaining small segment. There is no evidence that the sling was damaged to the point of being unsafe prior to the final lift in Philadelphia, rather, the damage leading to the failure was introduced during this final lift. It is also likely that the label was torn from the sling by this same event."

13. Dr. Pope's report makes no reference to any facts contained in the materials that he reviewed which support his hypothesis that the sling was pinched between the draft of lumber and "a portion of the ship" as it was being lifted out of the cargo hold on September 8, 2002 in the Port of Philadelphia.

14. There is no evidence that has been developed during the discovery phase of this case indicating that any portion of the draft of lumber in question pinched the sling against a portion of the ship while it was being lifted out of the vessel.

15. To the contrary, the evidence developed in the record on discovery demonstrates that the lift in question was conducted properly and safely, with no portion of the draft making contact with any portion of the ship. That evidence includes the following:

    a. **Fran Henderson,** the operator of the shore base crane which was lifting the draft of lumber out of the M/V "Morraborg" at the time of the accident, testified at deposition at pages 19 and 22[2] as follows:

> "Q. Tell us then what you can remember happening from the time you started raising that load until the time of the accident. What can you remember?
>
> A. It was a normal lift, like any other you lifted it up until you seen the load get out of the ship. Put the hoist lever in neutral, apply the brake, swing over the ship. Put the power down lever to lower the load down to the pier, drop it down on the pier at the same rate of speed that I always do. And when it was four foot, five foot off the deck, the nylon strap let loose, and all the lumber fell on Skinny."
>
> (p. 19)
>
> \* \* \* \*
>
> "Q. Now, so far you know, when that draft was on its way up, when it was on its way out, did it make any contact with any portion of the ship?
>
> A. No, sir."
>
> (p. 22)

    b. **Martinus Lukassen,** the Chief Officer employed aboard the M/V "Morraborg" at all times pertinent to this case, testified as follows at his deposition:

> i. "Q. ...And from your standpoint, did you have any criticism or problem with the way the longshoremen were conducting the operation?
>
> A. No.
>
> Q. Now, you were observing cargo operations at the time the accident happened; is that correct?

---

[2] Pages 19 and 22 of Mr. Henderson deposition are appended hereto collectively as Exhibit 3.

  A. That's correct."

(pp. 12-13)

ii. "Q. …At the time the accident happened, were you up on the ship?

  A. I was."

(p. 13)

iii. Chief Officer Lukassen placed a mark on a photograph identified as Exhibit P23N[3] indicating the location where he was standing at the time the accident happened.

(p. 16)

He went on to testify:

"Q. …And how long had you been standing in that position before the accident happened?

A. Very shortly.

Q. I understand that the lift or the hoist that was coming out at the time of the accident was the last unit of lumber that was in the tween deck at no. 2; is that right.

A. That's right?"

(p. 16)

iv. "Q. Did you have any problem or criticism during the day with the the way the shore crane was being operated?

A. No."

(p. 18)

v. "Q. Could you tell us now what you saw at the time of the accident?

---

[3] The photograph that was identified as Exhibit P23N is appended hereto as Exhibit 4. Please note an ink mark at the upper right hand portion of the photograph indicating the location where Chief Officer Lukassen was standing at the time of the accident.

        A.     During the actual accident?

        Q.     Well lets start from the time the hoist was lifted out of the hold, up until the time of the accident.

        A.     I did not really actually see the lifting out of the tween deck itself.

        Q.     Where was the hoist when you first saw it?
        A.     Half way the ship and the quay.

        Q.     It was on its way down?

        A.     Yeah."

(pp. 19-20).

    vi.    "Q.     Were you ever able to determine or find out what had caused the sling to break?

        A.     No.

        Q.     And later that day, did you and the master prepare a statement about this accident?

        A.     Correct.

        Q.     Let me show you – or you have it there – P10. Is that a copy of the statement?

        A.     Yes, it is.

        Q.     And you signed that, correct?

        A.     Correct."[4]

(p. 26)

    c.    Appended hereto as Exhibit 6, is a copy of Exhibit P10 identified at the deposition of Chief Officer Lukassen which is a copy of the joint statement prepared by Captain **Ferdinand Bijkerk** and Chief Officer Lukassen on September 8, 2002 regarding the accident in question. That report reads as follows:

        "Philadelphia

---

[4] Pages 12-13, 16, 18-20 and 26 from the transcript of Chief Officer Lukassen's deposition testimony are appended hereto collective as Exhibit 5.

08 September 2002

M/V MORRABORG

The 8th of September, motor vessel "MORRABORG" arrived at Philadelphia to discharge a cargo of paperreels and timber packages.

Discharging commenced the 8th at 13:00 LT2 gangs.

One gang was discharging paper in hold #1, while the other was discharging timber from the tweendeck of hold #2.

At 16:25 LT the stevedores lifted the last hoist of timber from the tweendeck. This hoist consisted of four units, each unit consisting of five packages. The average weight of one package is approximately 1100 pounds. Each unit is lifted by means of two slings, each sling has a SWL of 3.5 mt.

This last hoist was taken out and the ship's crew was standby to open the tween deck.

While this hoist was lowered toward the quay, stevedores started shouting. One end (the far end, at the sheds side) of the unit was rapidly going down. This made the total hoist out of balance, which caused the other end going down as well. Close to this hoist was the stevedore who started to walk backwards when he saw things coming. Unfortunately, he was not fast enough, especially because the top packages slid towards him and his way was blocked by the ship side and shore crane. Stevedores are not wearing any personnel protecting aid, e.g. helmets/safety shoes, etc. The unit fell apart and the packages slid over and against the stevedore. He was completely covered by timber. All cargo operations were stopped and stevedores and ship's crew started to free the victim. Ship stretcher and first aid kit were brought to the site professional medical assistance arrived shortly after.

Pictures were taken at the site and hoisting slings inspected. Slings turned out to be broken and cut as well to free the victim.

**Accident was closely witnessed by the Captain, who was ashore and by the Chief Officer, who was on deck."** (emphasis supplied.)

This joint statement of the Master and Chief Officer was appended to a report filed by Defendant Wagenborg with the United States Coast Guard. (See Report of Marine Accident, Injury or Death filed by the United States Coast Guard by Wagenborg and appended hereto as Exhibit 7.)

    d.    In addition to the joint statement prepared by the Master and Chief Officer, and the filing of the report with the United States Coast Guard, the Master of the vessel also prepared a separate report on September 9, 2002 in connection with the accident in question. This document was entitled "General Report" and was identified as Exhibit P11A at the Master's deposition. It is appended hereto as Exhibit 8. Under the heading of "Description of Cause of the Incident" there is absolutely no reference to any suggestion that the sling was damaged as a result of being pinched between the draft and the side of the ship on the way out of the cargo hold. This ties in with the Master's testimony at deposition indicating that he didn't know the reason why the sling parted, and that by the time of his deposition on August 17, 2006, he still didn't know the reason why the sling parted.

(pp. 136-137 of Deposition of Captain Bijkerk).[5]

    e.    Finally, appended hereto as Exhibit 10 is the Affidavit of **Michael Lennon**, a stevedore supervisor employed by the discharging stevedore, J.H. Stevedoring, Inc. Mr. Lennon indicates that he was in the cargo hold at the time the draft of lumber in question was lifted out of the hold by the shore crane being operated by Mr. Henderson. Mr. Lennon's Affidavit clearly indicates that the draft in question did not make any contact with any portion of the ship as it was being lifted out of the cargo hold.

16.    Dr. Pope's opinion that the subject sling broke because it was damaged "during the lift itself, i.e., the draft pinched the sling against a portion of the ship while it was being lifted from the ship in Philadelphia", should be precluded since it is based on an assumption lacking any factual foundation in the record and does not meet the requirements of F.R.E. 702, that such opinion be "based upon sufficient facts or data" and be "the product of reliable principles and methods."

17.    Dr. Pope acknowledges at page 1 of his report that "the label is missing from the sling..." As to how the label became missing, Dr. Pope concludes at Page 3 of his report:

"There is no evidence that the sling was damaged to the point of being unsafe prior to the final lift in Philadelphia, rather, the damage leading to the failure was introduced during this final lift. **It is also likely that the label was torn from the sling by the same event.**" (emphasis supplied).

Dr. Pope does not provide any information as to how the label would have been affixed to the sling and the mechanism or manner in which the label could have been torn from the sling during the lift.

---

[5] Pages 136-137 from Captain Bijkerk's deposition are appended hereto collectively as Exhibit 9.

18. Dr. Pope's opinion or conclusion that the label was torn from the sling when the draft pinched the sling against the portion of the ship on the way out of the cargo hold, should be precluded since it is based on an assumption lacking any factual foundation in the record and does not meet the requirements of F.R.E. 702 that such opinion be "based upon sufficient facts or data" and be "the product of reliable principles and methods".

WHEREFORE, it is respectfully requested that this Court enter the attached Order precluding the proposed opinion testimony of David P. Pope, Ph.D.

FREEDMAN AND LORRY, P.C.


By:_____/S/_____
STANLEY B. GRUBER
Attorneys for Plaintiffs