FREEDMAN AND LORRY, P.C.
BY: STANLEY B. GRUBER, ESQUIRE
IDENTIFICATION NO.: 22954
1601 Market Street, Second Floor
Philadelphia, PA 19103
(216) 925-8400
Attorneys for Plaintiff

---

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT REVAK and<br>MARGARET REVAK,<br>    Plaintiffs<br>v.<br><br>INTERFOREST TERMINAL<br>UMEA AB<br><br>    and<br><br>WAGENBORG SHIPPING B.V.,<br>    Defendants | CIVIL ACTION<br><br><br>NO. 03-4822 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE EXPERT OPINION TESTIMONY OF DEFENDANTS' LIABILITY EXPERT, DAVID P. POPE, PH.D.**

I. **STATEMENT**

Plaintiffs, Robert and Margaret Revak, seek damages from Defendants Interforest Terminal Umea AB ("Interforest") and Wagenborg Shipping BV ("Wagenborg") as a result of personal injuries suffered by Mr. Revak on September 8, 2002, while employed as a longshoreman assisting in the discharge of units of lumber from the M/V "Morraborg", a vessel owned by Wagenborg, which was berthed at Pier 80 in the Port of Philadelphia. The units of lumber had been stowed aboard the "Morraborg" by Interforest, a Swedish Stevedore, in August 2002, while the ship was berthed at Interforest's shipping terminal in Holmsund, Sweden

Plaintiffs contend that Defendant Wagenborg breached its "turnover duty" to Mr. Revak under Section 5(b) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §905(b), by failing to inspect the cargo sling which failed in this case, delegating its duty to inspect to Defendant Interforest, without providing Interforest any guidelines on how to properly conduct such an inspection in accordance with appropriate standards and without any understanding as to how Interforest would go about making such inspection, and turning its vessel over to Plaintiff's stevedore employer with the defective sling in place.

Plaintiffs contend that Defendant Interforest breached the duty imposed on it under the General Maritime Law of exercising reasonable care under the circumstances by failing to properly inspect the sling before placing it around a draft of lumber, failing to provide any guidance or instruction on the proper manner of inspection of such slings to those of its employees who were charged with that responsibility, and failing to take the sling out of service in light of visible edge and other damage, and a missing label -conditions which precluded use of the sling under appropriate International Standards.

It is undisputed that at about 4:30 p.m. on September 8, 2002, the sling in question failed, causing the draft of lumber that it was lifting to fan out like a deck of cards and fall on top of Mr. Revak.

Appended hereto as Exhibit 1 is the expert report of Robert A. Erb, Ph.D. Based upon his examination of the sling and his review of the materials referenced in his report, Dr. Erb opined as follows with regard to the cause of the failure of the sling (page 5):

> "Enclosure 5 shows the sling on both sides of the failure site. The process of pulling apart began on the side next to the millimeter ruler. Short fibers extended toward the break on that half of the sling. This indicates that there was damage to the fabric in that area prior to the failure. As a consequence, elongation before rupture was reduced in that area. With the failure of one-half of the sling, the remaining portion came under increasing tensile stress as it supported the load of lumber.
>
> The next section then began to fail, leaving longer fibers protruding at the break. Then finally the entire load was "hanging by a thread," the long strand at the edge, which finally broke.

2

> An examination of the areas of the sling near the break supports this failure mode. The failure site exhibits *both* edge damage and abrasive damage to the face. The edge area adjacent to 6.2 on the ruler is discolored and is degraded to the point that the multifilament threads have lost their form. Further away from the ruler there continues to be damage to the face of the sling.
>
> The defects shown on Enclosures 1 through 5 are types that would have been readily visible during a reasonable inspection of the sling prior to the accident."

At pages 4 and 6 of his report, Dr. Erb notes that the "The standards-specified label was missing" (Page 4) when he examined the sling and that the sling "clearly lacked its label and legible markings" (Page 6.)

At page 8 of his report, Dr. Erb goes on to quote from the European Standard in effect in 2002 for endless polyester woven slings (E.N. 1492-1:2000). As noted by Dr. Erb, Section 7 of that Standard provides that each sling shall be marked with certain information "both legibly and indelibly, on a durable label fixed directly onto the webbing", with information including the working load limit, the material of the webbing, the manufacturer's name and the traceability code, along with the number and relevant part of the European Standard in question. As noted at Page 10 of Dr. Erb's report, the European Standard in question goes on to note at D.2.3 that in the course of inspection of such a sling "…if any of the required markings have been lost or become illegible, the sling should be removed from service for examination by a competent person.[1]

Defendants have indicated that they intend to call David P. Pope, Ph.D., as a Materials Science Expert in this case. Appended hereto as Exhibit 2 is a copy of Dr. Pope's report dated November 26, 2006.

---

[1] Similarly, at Page 11 of his report, Dr. Erb references the American Society of Mechanical Engineers' Standards for synthetic webbing slings, and, specifically, Section 9-5.8.4 which provides that "a sling shall be removed from service if damage such as the following is visible…

    a.    Missing or illegible sling identification…"

3

Page 1 of Dr. Pope's report itemizes the materials that he examined or reviewed in connection with his investigation in this case. Those items include the subject sling, Dr. Erb's report, the pleadings, copies of photographs supplied by defense counsel, and the depositions of several of the witnesses in this case, including, Mr. Revak, and the Captain and Chief Officer of the M/V Morraborg. Dr. Pope does not indicate that he reviewed the deposition of Fran Henderson, the operator of the crane that lifted the load in question.

At page 1 of his report, Dr. Pope describes his assignment as follows:

> "Mr. Revak was injured by a bundle of lumber that fell on him when an endless polyester lifting sling failed. You asked me to determine, if possible, why the sling failed."

At page 3 of his report, Dr. Pope opines that the damage to the sling which caused it to fail "occurred during the lift itself, i.e., the draft pinched the sling against a portion of the ship while it was being lifted from the ship in Philadelphia."

Dr. Pope goes on to conclude at page 3 of his report:

> "In summary, I conclude the following to a reasonable degree of engineering certainty: The subject sling was damaged and its load bearing capacity was reduced by at least 80% while the draft was being lifted from the ship in Philadelphia. The remaining segment of the damaged sling could just carry the dead load of the draft, but a small increase in the load, as caused by moving the load as it was being positioned above the dock, was sufficient to break that remaining small segment. There is no evidence that the sling was damaged to the point of being unsafe prior to the final lift in Philadelphia, rather, the damage leading to the failure was introduced during this final lift. It is also likely that the label was torn from the sling by this same event."

Dr. Pope's report makes no reference to any facts contained in the materials that he reviewed which support his hypothesis that the sling was pinched between the draft of lumber and "a portion of the ship" as it was being lifted out of the cargo hold on September 8, 2002 in the Port of Philadelphia.

There is no evidence that has been developed during the discovery phase of this case indicating that any portion of the draft of lumber in question pinched the sling against a portion of the ship while it was being lifted out of the vessel.

To the contrary, the evidence developed in the record on discovery demonstrates that the lift in question was conducted properly and safely, with no portion of the draft making contact with any portion of the ship. That evidence includes the following:

    a.    **Fran Henderson,** the operator of the shore base crane which was lifting the draft of lumber out of the M/V "Morraborg" at the time of the accident, testified at deposition at pages 19 and 22[2] as follows:

> "Q.    Tell us then what you can remember happening from the time you started raising that load until the time of the accident. What can you remember?
>
> A.    It was a normal lift, like any other you lifted it up until you seen the load get out of the ship. Put the hoist lever in neutral, apply the brake, swing over the ship. Put the power down lever to lower the load down to the pier, drop it down on the pier at the same rate of speed that I always do. And when it was four foot, five foot off the deck, the nylon strap let loose, and all the lumber fell on Skinny."
>
> (p. 19)

\* \* \* \*

> "Q.    Now, so far you know, when that draft was on its way up, when it was on its way out, did it make any contact with any portion of the ship?
>
> A.    No, sir."
>
> (p. 22)

    b.    **Martinus Lukassen,** the Chief Officer employed aboard the M/V "Morraborg" at all times pertinent to this case, testified as follows at his deposition:

> i.    "Q.    …And from your standpoint, did you have any criticism or problem with the way the longshoremen were conducting the operation?
>
> A.    No.
>
> Q.    Now, you were observing cargo operations at the time the accident happened; is that correct?
>
> A.    That's correct."
>
> (pp. 12-13)

---

[2] Pages 19 and 22 of Mr. Henderson deposition are appended hereto collectively as Exhibit 3.

ii. "Q. ...At the time the accident happened, were you up on the ship?

A. I was."

(p. 13)

iii. Chief Officer Lukassen placed a mark on a photograph identified as Exhibit P23N[3] indicating the location where he was standing at the time the accident happened.

(p. 16)

He went on to testify:

"Q. ...And how long had you been standing in that position before the accident happened?

A. Very shortly.

Q. I understand that the lift or the hoist that was coming out at the time of the accident was the last unit of lumber that was in the tween deck at no. 2; is that right.

A. That's right?"

(p. 16)

iv. "Q. Did you have any problem or criticism during the day with the the way the shore crane was being operated?

A. No."

(p. 18)

v. "Q. Could you tell us now what you saw at the time of the accident?

A. During the actual accident?

Q. Well lets start from the time the hoist was lifted out of the hold, up until the time of the accident.

---

[3] The photograph that was identified as Exhibit P23N is appended hereto as Exhibit 4. Please note an ink mark at the upper right hand portion of the photograph indicating the location where Chief Officer Lukassen was standing at the time of the accident.

6

        A.    I did not really actually see the lifting out of the tween deck itself.

        Q.    Where was the hoist when you first saw it?
        A.    Half way the ship and the quay.

        Q.    It was on its way down?

        A.    Yeah."

(pp. 19-20).

vi.   "Q.    Were you ever able to determine or find out what had caused the sling to break?

        A.    No.

        Q.    And later that day, did you and the master prepare a statement about this accident?

        A.    Correct.

        Q.    Let me show you – or you have it there – P10. Is that a copy of the statement?

        A.    Yes, it is.

        Q.    And you signed that, correct?

        A.    Correct."[4]

(p. 26)

c.   Appended hereto as Exhibit 6, is a copy of Exhibit P10 identified at the deposition of Chief Officer Lukassen which is a copy of the joint statement prepared by Captain **Ferdinand Bijkerk** and Chief Officer Lukassen on September 8, 2002 regarding the accident in question. That report reads as follows:

"Philadelphia

08 September 2002

M/V MORRABORG

---

[4] Pages 12-13, 16, 18-20 and 26 from the transcript of Chief Officer Lukassen's deposition testimony are appended hereto collective as Exhibit 5.

7

The 8th of September, motor vessel "MORRABORG" arrived at Philadelphia to discharge a cargo of paperreels and timber packages.

Discharging commenced the 8th at 13:00 LT2 gangs.

One gang was discharging paper in hold #1, while the other was discharging timber from the tweendeck of hold #2.

At 16:25 LT the stevedores lifted the last hoist of timber from the tweendeck. This hoist consisted of four units, each unit consisting of five packages. The average weight of one package is approximately 1100 pounds. Each unit is lifted by means of two slings, each sling has a SWL of 3.5 mt.

This last hoist was taken out and the ship's crew was standby to open the tween deck.

While this hoist was lowered toward the quay, stevedores started shouting. One end (the far end, at the sheds side) of the unit was rapidly going down. This made the total hoist out of balance, which caused the other end going down as well. Close to this hoist was the stevedore who started to walk backwards when he saw things coming. Unfortunately, he was not fast enough, especially because the top packages slid towards him and his way was blocked by the ship side and shore crane. Stevedores are not wearing any personnel protecting aid, e.g. helmets/safety shoes, etc. The unit fell apart and the packages slid over and against the stevedore. He was completely covered by timber. All cargo operations were stopped and stevedores and ship's crew started to free the victim. Ship stretcher and first aid kit were brought to the site professional medical assistance arrived shortly after.

Pictures were taken at the site and hoisting slings inspected. Slings turned out to be broken and cut as well to free the victim.

**Accident was closely witnessed by the Captain, who was ashore and by the Chief Officer, who was on deck."** (emphasis supplied.)

This joint statement of the Master and Chief Officer was appended to a report filed by Defendant Wagenborg with the United States Coast Guard. (See Report of Marine Accident, Injury or Death filed by the United States Coast Guard by Wagenborg and appended hereto as Exhibit 7.)

d.  In addition to the joint statement prepared by the Master and Chief Officer, and the filing of the report with the United States Coast Guard, the Master of the vessel also prepared a separate report on September 9, 2002 in connection with the accident in question. This document was entitled "General Report" and was identified as Exhibit P11A at the Master's deposition. It is appended hereto as Exhibit 8. Under the heading of "Description of Cause of the Incident" there is

Case 2:03-cv-04822-RBS   Document 66-2   Filed 08/14/2009   Page 9 of 15

absolutely no reference to any suggestion that the sling was damaged as a result of being pinched between the draft and the side of the ship on the way out of the cargo hold. This ties in with the Master's testimony at deposition indicating that he didn't know the reason why the sling parted, and that by the time of his deposition on August 17, 2006, he still didn't know the reason why the sling parted.

(pp. 136-137 of Deposition of Captain Bijkerk).[5]

  e. Finally, appended hereto as Exhibit 10 is the Affidavit of **Michael Lennon**, a stevedore supervisor employed by the discharging stevedore, J.H. Stevedoring, Inc. Mr. Lennon indicates that he was in the cargo hold at the time the draft of lumber in question was lifted out of the hold by the shore crane being operated by Mr. Henderson. Mr. Lennon's Affidavit clearly indicates that the draft in question did not make any contact with any portion of the ship as it was being lifted out of the cargo hold.

## II. ARGUMENT

Following the Supreme Court's seminal decisions in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u> 509 U.S. 579 (1993) and <u>Komho Tire Co. v. Carmichael</u> 526 U.S. 137 (1999), governing the admissibility of expert testimony, F.R.E. 702 was amended to read as follows:

> **"Rule 702. Testimony by Experts**
>
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

The Third Circuit has explained that Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit". <u>Estate of Schneider v. Fried</u>, 320 F. 3rd 396, 404 (3rd Cir. 2003). As Supreme Court in <u>Daubert</u> noted at Page 597:

> "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it…The role of the Court is to act as a 'gatekeeper' assuring that opinion testimony that could be misleading because it does not meet these requirements does not reach the jury…"

---

[5] Pages 136-137 from Captain Bijkerk's deposition are appended hereto collectively as Exhibit 9.

9

Daubert applies not only to scientific knowledge, but also to testimony based on technical and other specialized knowledge.  See Kohmo Tire Co., supra.

Recently, in Johnson S.J.P Management LLC, 78 Fed. R. Evid. Serv. 923 (E.D.. Pa. 2009), this Court had occasion to make a detailed analysis of the **Daubert-Kohmo** requirements.  In discussing the requirements of "reliability" and "fit" this Court noted:

> "The requirement of 'reliability' dictates that 'an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable'. Pineda, 520 F.3d at 247 (citing Daubert, 509 U.S. at 589).  The process is said to be reliable if it is 'based on the methods and procedures of science rather than on subjective belief or unsupported speculation.' In re Paoli, 35 F.3d at 741-43.  A litigant must make more than a prima facie showing that its expert's methodology is reliable.  However, the Third Circuit has cautioned that '[t]he evidentiary requirement of reliability is lower than the merits standard of correctness.' In re Paoli, 35 F.3d at 744…In assessing the 'reliability' of expert testimony, a court should consider:  (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.  Pineda, 520 F.3d at 247-48…A court has the discretion to consider other additional factors and to determine whether all of these designated factors must be considered in every case.  Elcock v. Kmart Corp., 233 F.3d 734, 746 (3rd Cir. 2000); See also Pineda, 520 F.3d at 247 (noting that the factors 'are neither exhaustive nor applicable in every case').
>
> The final requirement is that the expert testimony must 'fit' the issues in the case.  'In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." Schneider, 320 F.3d at 404.  'Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility'.  Daubert, 509 U.S. at 591-92.  'The adjective 'scientific' implies a grounding in the methods and procedures of science.' Id. at 590.  'Admissibility thus depends in part upon 'the proffered connection between the scientific research or test result to be presented and the particular disputed factual issues in the case.'  This standard is not intended to be a high one….' Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3rd Cir. 2000). **A court 'must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used.'** Id. (Citing Heller v. Shaw Indus., Inc., 167 F.3d 146, 153 (3rd Cir. 1999)).  **'A court may conclude that there is simply too great a gap between the data and the opinion proffered.'** General Electric Co. v. Joiner, 522 U.S. 136, 146…1997)." (emphasis supplied).

Here, it is submitted that Dr. Pope's proposed opinion testimony should be precluded from evidence at the trial of this case because (1) it is not based upon sufficient facts or data and (2) it is not

10

the product of reliable principles and methods. Specifically, Dr. Pope's opinions are based on assumptions that lack any factual foundation in the record.

In <u>Stecyk v. Bell Helicopter Textron, Inc.</u>, 295 F.3d 408, 414 (3rd Cir. 2002), the Third Circuit held that:

> "It is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record".

In so doing, the Third Circuit relied on its earlier holding in <u>Elcock v. Kmart Corp.</u>, 233 F.3d 734, 756 (3rd Cir. 2000).

In <u>Elcock</u>, the Court, relying on its earlier decision in <u>Gumbs v. International Harvester, Inc.</u>, 718 F.2d 88, 98 (3rd Cir. 1983), concluded that an expert's "assumption absent 'sufficient factual predicates'", was a "castle made of sand". See <u>Benjamin v. Peter's Farm Condominium Owners Association</u>, 820 F.2d 640, 642 (3rd Cir. 1987).

The requirement of a "sufficient factual foundation" for expert testimony noted in <u>Benjamin</u> and <u>Gumbs</u>, was referred to by the Court in <u>Elcock</u> as the "foundation requirement for expert testimony". As the <u>Elcock</u> Court noted at Footnote 13 (233 F. 3d at p. 755):

> "Interestingly, though the foundation requirement for expert testimony is well developed in the case law and in the experience of trial lawyers and judges, neither our opinions in Gumbs and Benjamin nor the evidence treatises themselves expressly ground this requirement in one of the Federal Rules of Evidence or in the legislative history or advisory committee notes accompanying the rules. Like the case law and trial practice governing cross-examination for bias, see <u>United States v. Abel</u>, 469 U.S. 45, 49...(1984), the foundation requirement is a rule of evidence that can only be found in the interstitial gaps among the federal rules."

Thus, the Court in <u>Elcock</u> determined that the "foundation requirement is derived through the "interstitial gaps" among Evidence Rules 702, 703, 402 and 403, and explained at page 757:

> "Given the realties of litigation, the opinion of a witness impressed by the court with the label of 'expert' may carry a great deal of weight with a lay jury, particularly in matters as complex as lost future earnings assessments. Permitting such a witness to offer an opinion unsupported by a sufficient factual foundation would significantly increase the risk of misleading the jury and confusing the issues, the very dangers against which Rule 403 defends."

11

While Elcock dealt with the admissibility of testimony of an economist rendering an opinion on lost future earnings, the Third Circuit has determined that the "foundation requirement" enunciated in Elcock extends beyond consideration of expert economic testimony. Thus, in Stecyk, supra, the Third Circuit applied the "foundation requirement" to an opinion being offered by a "failure analysis expert", with respect to the failure of the piece of equipment involved in that case.[6] Similarly, in Meadows v. Anchor Longwall and Rebuild, Inc., 2000 U.S. Dist. LEXIS 32764 (W.D. Pa. 2007), the Court applied the foundation requirement in deciding a Motion in Limine brought to preclude the expert testimony of an engineer regarding the cause of a valve malfunction. The Court in Meadows concluded that the absence of an adequate factual foundation results in a failure to comply with the "fit" requirement of Rule 702 – a conclusion that echoed the reasoning of the Third Circuit in Elcock. See 233 F.3d at p. 755 n. 13.

The "foundation requirement" can also be derived from a post-Daubert decision of the Supreme Court. General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997). There, the Supreme Court held that:

> "Conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either Daubert or Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and opinion proffered."

The term "ipse dixit" has been defined as "a bare assertion resting on the authority of an individual"[7], or "an unsupported dogmatic assertion"[8]

This Court has also rejected expert testimony based on unsupported speculation. See Johnson v. S.J.P. Management LLC, supra, and Willis v. Besam Automatic Entrance Sys., Inc., 2005 U.S. Dist. LEXIS 26466 (Ed. PA. 2005), aff'd 228 Fed. App'x 246 (3rd Cir. 2007).

---

[6] In Stecyk, the Court found that the record reflected a sufficient factual foundation to support the expert's opinion.
[7] See Black's Law Dictionary, 6th Edition, p. 828.
[8] See "The Free Dictionary" on Google.

Here, Dr. Pope's opinion that the failure of the sling was due to damage sustained when it was pinched between the draft and the side of the ship while being lifted out of the vessel is clearly nothing more than a "bare assertion" resting solely on Dr. Pope's say-so – an assertion which flies in the face of the factual record developed in this case.

Thus, the crane operator lifting the load out of the cargo hold of the ship clearly testified that the draft did not make contact with any portion of the ship on its way of the cargo hold. The sworn statement of Michael Lennon, a stevedore supervisor who was present in the cargo hold at the time the draft was being lifted out of the hold, states that there was no contact between the draft and any portion of the ship as the load was being taken out of the hold.

Moreover, the vessel's Chief Officer was standing in a position to observe the load in question as it came out of the hold, and the Master of the vessel was also on duty at the time the accident occurred. Nonetheless, the statement jointly prepared by the Master and Chief Officer contemporaneous with the happening of the accident (Exh. 6) makes no reference to any contact between the draft and any portion of the ship. Significantly, such joint statement was appended to the Accident Report filed by Defendant Wagenborg with the United States Coast Guard (See Exhibit 7). Indeed, both the Master and Chief Officer testified at deposition that they did not know what caused the sling to fail.

Dr. Pope's report does not reference any portion of the factual record in this case in support of his hypothesis, other than reference to pages 53-54 of the deposition testimony of Leif Eriksson, a stevedore foreman employed by Interforest at its terminal in Holmsund, Sweden. Mr. Eriksson, of course, was not present in Philadelphia on September 8, 2002 when the accident in question took place. Mr. Eriksson testified at Pages 53-54 of his deposition that he has "seen situations where slings have come apart as a result of touching a bulkhead or the side of a hatch."[9]

---

[9] Pages 53-54 of Mr. Eriksson's deposition are appended hereto as Exhibit 11.

On the other hand, when viewing photographs of the torn sling in this case, Mr. Eriksson testified as follows at Page 51:[10]

"Q. Have you ever seen a polyester sling torn in that fashion?

A. I do not think so.

Whether or not Mr. Eriksson ever saw a sling come apart as a result of touching a bulkhead has no bearing on what happened in this case. Clearly, the testimony of Mr. Eriksson falls far short of providing the factual foundation necessary to support Dr. Pope's otherwise factually unsupported opinions.

Finally, Dr. Pope's conclusion that "it is also likely that the label was torn from the sling" during the final lift is total speculation and fails any test of "reliability". Dr. Pope makes no effort to explain how these labels are sewn into or otherwise affixed to the slings, and the manner and mechanism by which any portion of the sling being pinched between the draft and the bulk head of the ship would have torn the label from the sling. By throwing this highly speculative sentence in at the end of the last paragraph of his report, Dr. Pope has confirmed that his opinions are, indeed, nothing more than speculation without any factual predicate to support such a "castle of sand".

---

[10] Page 51 of Mr. Eriksson's deposition transcript is included in Exhibit 11.

14

## III. **CONCLUSION**

For all the foregoing reasons, it is respectfully submitted that the opinions proffered by Dr. Pope fail to satisfy the foundation requirement enunciated by the Third Circuit in Elcock and Stecyk and that accordingly, such opinion testimony should be precluded in this case.

Respectfully submitted

FREEDMAN AND LORRY, P.C.


By:_____/S/_____
STANLEY B. GRUBER
Attorneys for Plaintiffs